Rubin WEEKS, Appellant,

v.

STATE of Missouri, Respondent.

and

State of Missouri, Respondent,

v.

Rubin Weeks, Appellant.

Nos. SC 85448, SC 85552.

Supreme Court of Missouri,
En Banc.

Aug. 3, 2004.

**40**

Ellen Y. Suni, Phillip R. Gibson, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrew W. Hassell, Asst. Atty. Gen., Jefferson City, for Respondent.

Steven A. Drizin, Chicago, IL, Sean D. O'Brien, Kansas City, Vanessa Potkin, New York, NY, for amicus curiae.

LAURA DENVIR STITH, Judge.

Rubin Weeks pleaded guilty to kidnapping and forcible rape in 1992. In 2001, he filed a motion with the sentencing court under what is now section 547.035, RSMo Supp.2001,[1] claiming that DNA testing of the sperm samples taken in relation to the rape will demonstrate his innocence of the crimes of which he was convicted. The motion court overruled his motion based on its belief that persons, such as Mr.

1. All statutory references are to RSMo Supp. 2001 unless otherwise indicated.

Weeks, who were convicted based upon a guilty plea rather than after trial are not entitled to invoke the benefits of section 547.035 even if they otherwise meet its requirements.

This Court reverses. The plain language of section 547.035 states that a person committed to the department of corrections may bring a motion, not merely those committed following trial. It also states that in determining whether DNA testing is available, the sentencing court may consider the transcript of the movant's trial *or guilty plea* and sentencing hearing. By its terms, the statute permits persons who have pleaded guilty to seek DNA testing. The motion court clearly erred in determining otherwise and in determining that the other requirements for a court order for DNA testing were not met by Mr. Weeks. Pursuant to Rule 84.14, this Court reverses and remands with directions to order appropriate DNA testing in the manner set out in section 547.035.7.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 13, 1991, as J.B. began to drive home after working a late shift as a front desk clerk at a motel in Cape Girardeau County, she noticed that the car behind her was flashing its headlights. She pulled over and partially rolled down her window as the man driving the other car got out and came toward her car. The man, described as approximately 5′ 10″ tall and weighing about 235 pounds, reached in through the window with a knife. She struggled with him, cutting her hands and chin. The man then dragged her out of her car, forced her into his vehicle, and drove away. He touched her body inside her shirt while they were driving, ordered her to take off her pants, and touched her vaginal area. As they drove, he asked J.B.

when she had last had sex. J.B., who was married, told him she had sex the day before.

As the man drove he crossed into Bollinger County and parked near a barn, where he laid J.B. on the ground, performed oral sex, and had intercourse with her. Twice during this ordeal the man stopped as he heard sounds, and then he told her to put on her clothes. She did not put on any undergarments but did put on her pants. The man then duct taped her hands, ankles, and knees and drove off. Once she was able to work free of the tape she ran down the road in her pants, leaving her pantyhose at the scene, and sought help at a nearby farmhouse.

J.B. was taken to a hospital. Using a rape kit, samples of semen were collected from her pants and with a vaginal swab.

Police suspected that the rapist might have been the man who had occupied Room 11 at the motel where J.B. worked the night of the rape. They obtained various fingerprints and cigarette butts from the room and checked on the address given when the occupant had registered. That address was for a trucking business in Mississippi. The police traveled to this business and showed a composite drawing of the suspect to one of the employees. One employee thought that it resembled Mr. Weeks, so the police focused on him. Mr. Weeks was arrested in Mississippi on November 2, 1991, and was delivered to Cape Girardeau three days later. In December 1991, Mr. Weeks was charged with kidnapping in Cape Girardeau County and was charged with armed criminal action, forcible rape, and forcible sodomy in Bollinger County.

Two months previously, when the police were searching for the rapist, the rape kit and dozens of other items retrieved from Room 11 were sent to Southeast Missouri Regional Crime Laboratory (SEMO) for

fluid and print testing. SEMO issued its first report on November 8, 1991, and revised it in minor respects on November 26, 1991. The report noted that intact human spermatoza were located on both the vaginal swab and the victim's pants, which SEMO considered as evidence for J.B. "having been involved in sexual intercourse, which culminated in ejaculation." At this time, in 1991, SEMO did not conduct DNA testing. Rather, serology tests were performed on the samples in an attempt to determine blood type. These tests showed the semen had been discharged by a person with Type–A blood who was a "secretor," that is, the person's blood type could be determined by examining his bodily fluids. Usable palm prints were also found on one of the items sent to SEMO.

Based on this report, the State obtained a search warrant and collected Mr. Weeks' blood, hair, and saliva for testing. These samples were also sent to SEMO for testing in late November 1991. While these samples were being tested, Mr. Weeks was charged with the crimes mentioned above and was provided a copy of SEMO's November reports. On January 7, 1992, Mr. Weeks filed a request for production in Cape Girardeau County, requesting the results of any tests, experiments, or comparisons. Mr. Weeks filed an identical motion in Bollinger County before his February 13, 1992 plea.

SEMO completed its updated report on February 12, the day before Mr. Weeks' guilty plea hearing was scheduled. Although encompassed by the defense's requests for production, this report was not disclosed to Mr. Weeks or the trial court before the plea. This report contained both exculpatory and inconclusive information. It was exculpatory in that the report noted that someone other than Mr. Weeks smoked the cigarettes found in Room 11. Moreover, none of the hairs tested belonged to him nor was a print match found. The report was also inconclusive in two noteworthy respects. First, the report noted Mr. Weeks could not be eliminated from the population that could have deposited the seminal fluid in the victim's pants, but that "it would appear that another individual's seminal fluid is also present." Second, the report's finding indicates this inability may have been because SEMO was unable to determine Mr. Weeks' blood type from the saliva sample he provided in accordance with the search warrant. Thus, Mr. Weeks is a "non-secretor." This further suggested he could not have been the source of the semen samples. A DNA test would determine whether he was the source of these samples.

Although the report was completed on February 12, 1992, the day before the scheduled plea hearing, the prosecution did not produce it to defendant or his counsel, or to the court, nor did the prosecutor change the deadline by which Mr. Weeks had to agree to plead guilty. Accordingly, unaware of these findings in the report, the plea hearing proceeded as scheduled on February 13, 1992. Mr. Weeks pleaded guilty to kidnapping in Cape Girardeau County and to forcible rape in Bollinger County and was sentenced to concurrent terms of thirty years and life imprisonment.[2] During his plea

---

2. This Court need not reach Mr. Weeks' suggestion that the prosecutor purposely hid what he knew was exculpatory evidence so as to cause him to plead guilty. As the State notes, this is more appropriately addressed in the context of a habeas corpus motion in

which the prosecution's serious alleged violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), can be explored. This Court rejects the State's argument that because the report was not included in the record before the guilty plea court,

hearing, he did not personally describe the events that formed the basis of the charges. Rather, the prosecutor recited the conduct in which Mr. Weeks had allegedly engaged and asked whether he was guilty of those acts and he agreed that he was.[3]

Section 547.035 was effective on August 28, 2001. As the statute itself states, its purpose was to permit convicted persons an opportunity to obtain DNA testing in an effort to show their innocence in instances in which there is a reasonable probability that, if such testing results were exculpatory, the defendant would not have been convicted. *Sec. 547.035.7.*

On October 3, 2001, Mr. Weeks filed a post-conviction motion for forensic DNA testing under Rule 29.17 in the Circuit Court of Cape Girardeau County. A similar motion was filed on January 30, 2002, in Bollinger County.[4] After reviewing the motions, the motion court issued show cause orders to the State to show why Mr. Weeks should not be entitled to such DNA testing. On April 1, 2002, the court denied the motion as to both cases in a single written judgment, without a hearing. It found that a person such as Mr. Weeks who had pleaded guilty was not entitled to invoke the statute and could not meet the

statutory requirement of showing that the identity of the perpetrator was in issue. It also found that Mr. Weeks failed to satisfy his burden under section 547.035.2 of alleging facts showing that DNA testing was not reasonably available to him at the time of trial and that a reasonable probability exists that he would not have been convicted if exculpatory results had been obtained through DNA testing. *Sec. 547.035.2(3)(a), (4)-(5).*

Mr. Weeks appealed the court's ruling in regard to the Cape Girardeau County conviction for kidnapping to the Missouri Court of Appeals, Eastern District. Because Mr. Weeks was also convicted of rape in Bollinger County, he appealed the denial of relief as to that crime to the Missouri Court of Appeals, Southern District. After opinion by the eastern district, and prior to opinion by the southern district, this Court ordered transfer and consolidation of the two cases in this Court. *Mo. Const. art. V, sec. 10.*

## II. ANALYSIS

### A. Standard of Review.

Although section 547.035.1 does not specifically set out a standard of review, it provides that a motion for DNA testing is a post-conviction motion, governed by the

---

nor produced nor even revealed to Mr. Weeks until counsel were appointed for him in the fall of 2003 following denial of his motion for DNA testing, therefore it cannot be considered by this Court. This Court has already ordered this report included in the supplemental record on appeal.

**3.** The two remaining counts were subsequently dropped. Because Mr. Weeks missed the deadline for filing a Rule 24.035 motion, he filed for a writ of habeas corpus in the circuit court, which was denied. His petition for writ of habeas corpus was also denied without hearing in a federal district court. The United States Court of Appeals for the Eighth Circuit, in a divided opinion, also denied him

relief. *See Weeks v. Bowersox,* 119 F.3d 1342 (8th Cir.1997).

**4.** Rule 29.17 was a rule adopted by this Court on February 20, 2001, to be effective September 1, 2001, to permit those who met the predicates set by the rule to apply for DNA testing. A few months after the rule was adopted, the legislature adopted section 547.035, which is identical in all relevant respects with this Court's Rule 29.17. This Court, therefore, withdrew Rule 29.17 on August 21, 2001. The parties referred to Rule 29.17 in their motions in the court below, but because section 547.035 was in effect at the relevant time, this Court hereafter will refer to section 547.035 rather than to Rule 29.17.

rules of civil procedure insofar as applicable. Rules 29.15 and 24.035 set out the applicable standard of review for other post-conviction motions. This Court therefore will apply the standard of review set out therein to its review of denial of a post-conviction motion for DNA testing under section 547.035.

■■■■ This Court's review of denial of a post-conviction motion under Rules 29.15 and 24.035 is limited to a determination whether the motion court's findings of fact and conclusions of law were clearly erroneous. *State v. Brown*, 998 S.W.2d 531, 550 (Mo. banc 1999). "The motion court's findings and conclusions are clearly erroneous only if, after the review of the record, the appellate court is left with the definite and firm impression that a mistake has been made." *Id.* Here, Mr. Weeks' motion was denied without a hearing. Section 547.035.6 provides that a movant is entitled to a hearing unless "the court finds that the motion and the files and records of the case conclusively show that the movant is not entitled to relief...." *Sec.* 547.035.6. This Court reviews the lower court's deter-

mination that no hearing was required for clear error. *See, e.g., Brown*, 998 S.W.2d at 550; *State v. Yarber*, 829 S.W.2d 479, 482 (Mo.App. E.D.1992) (applying standard in context of Rule 29.15).

*B.  Section 547.035 Permits DNA Testing of Individuals Who Have Pleaded Guilty.*

Section 547.035 permits a person who is in the department of corrections and who claims "that forensic DNA testing will demonstrate the person's innocence of the crime for which the person is in custody" to file a post-conviction motion in the sentencing court seeking such testing. *Sec.* 547.035.1.

■■■■ The State does not contest that Mr. Weeks is in the department of corrections or that he filed a motion in the sentencing court seeking such testing. Neither does it contest that he met the first two requirements of section 547.035.2 by alleging facts demonstrating that DNA evidence that can be tested exists and was secured in relation to the crime.[5] But, the State argues

---

**5.** Section 547.035 states, in its entirety:

1. A person in the custody of the department of corrections claiming that forensic DNA testing will demonstrate the person's innocence of the crime for which the person is in custody may file a postconviction motion in the sentencing court seeking such testing. The procedure to be followed for such motions is governed by the rules of civil procedure insofar as applicable.
2. The motion must allege facts under oath demonstrating that:
(1) There is evidence upon which DNA testing can be conducted; and
(2) The evidence was secured in relation to the crime; and
(3) The evidence was not previously tested by the movant because:
(a) The technology for the testing was not reasonably available to the movant at the time of the trial;
(b) Neither the movant nor his or her trial counsel was aware of the existence of the evidence at the time of trial; or

(c) The evidence was otherwise unavailable to both the movant and movant's trial counsel at the time of trial; and
(4) Identity was an issue in the trial; and
(5) A reasonable probability exists that the movant would not have been convicted if exculpatory results had been obtained through the requested DNA testing.
3. Movant shall file the motion and two copies thereof with the clerk of the sentencing court. The clerk shall file the motion in the original criminal case and shall immediately deliver a copy of the motion to the prosecutor.
4. The court shall issue to the prosecutor an order to show cause why the motion should not be granted unless:
(1) It appears from the motion that the movant is not entitled to relief; or
(2) The court finds that the files and records of the case conclusively show that the movant is not entitled to relief.
5. Upon the issuance of the order to show cause, the clerk shall notify the court re-

that Mr. Weeks is unable to meet the requirements of section 547.035.2(3)-(5) that:

(3) The evidence was not previously tested by the movant because:

  (a) The technology for the testing was not reasonably available to the movant at the time of trial;

  (b) Neither the movant nor his or her trial counsel was aware of the existence of the evidence at the time of trial; or

  (c) The evidence was otherwise unavailable to both the movant and movant's trial counsel at the time of trial; and

(4) Identity was an issue in the trial; and

(5) A reasonable probability exists that the movant would not have been convicted if exculpatory results had been obtained through the requested DNA testing.

*Sec.* 547.035.2(3)-(5).

Specifically, the State argues that because the phrase "at the time of trial" is used in certain clauses of the statute, only persons who were convicted after trial can seek DNA testing under the statute. It asserts that the statute, therefore, cannot apply to persons who have pleaded guilty.

This Court disagrees. The State's interpretation results from an unduly narrow reading of the statute, which in turn results from its failure to read the statute as a whole. Subsection 1 of the statute governs who can bring a motion under it. That subsection does not limit movants to those who were convicted after trial, nor does it state that persons who have pleaded guilty cannot bring a motion under the statute. To the contrary, subsection 1 states that a motion may be brought by a "person in the custody of the department of corrections claiming that forensic DNA testing will demonstrate the person's innocence." *Sec.* 547.035.1. Clearly, both those convicted after guilty pleas and those convicted after trial fall within these statutory perimeters.

The State's argument also ignores section 547.035.5, which states that:

5. Upon issuance of the order to show cause, the clerk shall notify the court reporter to prepare and file the *transcript of the trial or the movant's guilty plea and sentencing hearing* if the transcript has not been prepared or filed.

porter to prepare and file the transcript of the trial or the movant's guilty plea and sentencing hearing if the transcript has not been prepared or filed.

6. If the court finds that the motion and the files and records of the case conclusively show that the movant is not entitled to relief, a hearing shall not be held. If a hearing is ordered, counsel shall be appointed to represent the movant if the movant is indigent. The hearing shall be on the record. Movant need not be present at the hearing. The court may order that testimony of the movant shall be received by deposition. The movant shall have the burden of proving the allegations of the motion by a preponderance of the evidence.

7. The court shall order appropriate testing if the court finds:

(1) A reasonable probability exists that the movant would not have been convicted if exculpatory results had been obtained through the requested DNA testing; and

(2) That movant is entitled to relief.

Such testing shall be conducted by a facility mutually agreed upon by the movant and by the state and approved by the court. If the parties are unable to agree, the court shall designate the testing facility. The court shall impose reasonable conditions on the testing to protect the state's interests in the integrity of the evidence and the testing process.

8. The court shall issue findings of fact and conclusions of law whether or not a hearing is held.

*Sec.* 547.035.

*Sec.* 547.035.5 (emphasis added). The emphasized language even more directly demonstrates that the legislature contemplated DNA testing could be sought by persons who had pleaded guilty, for only those who have pleaded guilty have guilty plea transcripts. No reasonable alternative reading of the language is possible.

Given the statute's broad language, it is curious that subsections 3 and 4 of section 547.035 discuss what knowledge was available and whether identity was at issue "at the time of trial." But, in seeking to give meaning to the use of this phrase, the State would deny meaning to the above sections of the statute, that, as noted, clearly anticipate that those who have pleaded guilty may seek DNA testing. Perhaps the answer is best found by focusing on the word *time* rather than the word *trial.* The legislature sought to ensure that a movant did not have the opportunity for DNA testing at the *time* of his conviction, and therefore required a showing that the DNA evidence as to which testing was sought was not available for testing when the trial would have occurred. The fact that no trial ended up taking place due to a guilty plea would not detract from this purpose. *Cf. Rule* 24.035(c) (referring to judge who took movant's plea and sentence as the "trial court").

■ Only this interpretation gives meaning to the fact that the statute on its face applies to those who have had guilty plea hearings. The State's interpretation would render the reference to persons incarcerated in the department of corrections, and to guilty plea hearing transcripts, superfluous, and this Court presumes that the General Assembly does not enact meaningless provisions. *Bachtel v. Miller County Nursing Home Dist.,* 110 S.W.3d 799, 805 (Mo. banc 2003).

Finally, this Court rejects the State's suggestion that to make DNA testing available to those who pleaded guilty is inconsistent with the purposes behind the statute. Its argument is necessarily premised on the assumption that all those who plead guilty are in fact guilty, for it cannot be saying that it would keep an innocent person in prison if DNA testing showed the person to be innocent, even if the person pleaded guilty.

■ But, once a person is convicted, the presumption of innocence disappears regardless whether the person pleaded guilty or was found guilty by a judge or jury. A person who pleaded guilty is not somehow "more" guilty, or less deserving of a chance to show actual innocence, than one who went to trial. The question addressed by the statute is simply whether a person who has been convicted and sent to the department of corrections should nonetheless have the benefit of DNA testing when the person shows a reasonable probability that, if the results are exculpatory, the person would not have been convicted.

Certainly, as a practical matter, it can be anticipated that fewer persons who have pleaded guilty will be able to meet the requirement of the statute that they show that a reasonable probability exists that they would not have been convicted if exculpatory results had been obtained through DNA testing. But, if they can make this showing, the statute requires such testing.[6]

---

6. It has been reported that there are at least 125 cases of proven false confessions, in which a person has confessed to a crime, only to have another proved guilty. **Steven A. Drizin & Richard A. Leo,** *The Problem of* *False Confessions in the Post–DNA World,* 82 N.C. L.Rev. 891, 932–43 (2004). According to this study, at least fourteen persons within this group not only confessed, but pleaded guilty to crimes they were later shown not to

*C. Mr. Weeks Sufficiently Alleged Identity was at Issue.*

▮ The State also argues that Mr. Weeks cannot meet the statutory requirement of alleging facts demonstrating that identity was in issue at the trial, since he admitted his guilt at the plea hearing.[7] To the extent this argument is merely a restatement of the argument that a guilty plea movant can never show that identity was at issue in the trial, it is rejected for the reasons noted above. It would be absurd to say that the legislature intended to let a person who pleaded guilty file a motion that the person was certain not to win because in pleading guilty the person necessarily admitted his identity as the perpetrator. This Court presumes that the legislature did not intend an absurd result. *In re Beyersdorfer*, 59 S.W.3d 523, 526 (Mo. banc 2001). If the facts placed the perpetrator's identity at issue, then the mere existence of the guilty plea does not preclude the movant from seeking relief. The statute's requirements are met if the movant demonstrates that up to the time of the plea—as that is as far in the trial process as the case proceeded—identity was at issue.[8]

Mr. Weeks met this standard. Before February 13, 1992, Mr. Weeks declined to plead guilty. On February 12, 1992, the prosecution received the laboratory report from SEMO showing that none of the tested items conclusively identified Mr. Weeks as the rapist. Among dozens of items tested, SEMO also tested the cigarette butts located in Room 11. The report stated that Mr. Weeks may be eliminated from the population that smoked those cigarettes. Moreover, the report stated that a comparison of the fingerprints taken from the automobile and the motel room did not match Mr. Weeks' prints. Mr. Weeks has adequately shown that then, as now, identity was at issue.[9]

*D. Mr. Weeks Sufficiently Alleged Facts Showing that DNA Testing was Not Reasonably Available to Him at the Time He Pleaded Guilty.*

▮ The State also claims that Mr. Weeks did not allege sufficient facts to support his claim that DNA testing was not reasonably available to him at the time of his plea. The State argues that to meet the statutory standard, Mr. Weeks had to show that DNA testing was not technologically feasible when Mr. Weeks pleaded guilty in 1992. And, noting that this Court

---

have committed. **Drizin & Leo,** *False Confessions, supra,* at 957, 960.

7. The State argues that Mr. Weeks failed to verify his motion under oath as required by section 547.035.2. This error was corrected during the course of appeal.

8. Identity is not always at issue in a rape case. For instance, if a person accused of rape admits to having sexual intercourse with the victim, but claims that she consented, identity would not be at issue, and no DNA test would be required.

9. Of course, the movant must also continue to claim that he was not the perpetrator, or there would be no prejudice from denying DNA testing. Mr. Weeks has done so here.

His motion named six witnesses placing him in Mississippi on the night of the rape, including his ex-wife, who also provided a notarized affidavit to this effect. Mr. Weeks also claimed the DNA, blood and saliva samples, and fingerprint evidence would prove that it was another man who raped and assaulted the victim, not him. On appeal, this evidence has been supplemented with the final, but previously unproduced, police laboratory report showing that various items of evidence taken from the car, motel room, and scene that the police had tested to see if they identified Mr. Weeks, did not identify him. The reports also showed bodily fluids left by a Type–A secretor; as noted, the laboratory found that Mr. Weeks is a non-secretor.

stated in *State v. Davis,* 814 S.W.2d 593, 599 & n. 4 (Mo. banc 1991), that two private laboratories in the United States could then test DNA evidence, it says that, obviously, DNA testing was technologically feasible.

The State misconstrues the statutory requirement. It does not state that the movant must prove that DNA testing was not technologically possible or was unavailable anywhere at the time of trial. If that were the relevant issue, then the legislature could merely have consulted with scientists, determined the date on which the first DNA testing laboratory opened in the United States, and said that only persons convicted prior to that date were eligible for relief under the statute. That is, in effect, what the State argues for in stating that because two United States laboratories could do DNA testing in 1992, this requirement could never be satisfied by Mr. Weeks or others convicted after at least 1991.

The legislature did not choose to so severely restrict the impact of the statute, or to set a specific limiting date. Rather, the statute states only that the movant must show that "the technology for the testing was not *reasonably available to the movant* ...." *Sec.* 547.035.2(3)(a) (emphasis added). In other words, the test is a *subjective* one, subject to a *reasonable availability* standard, not a question of objective scientific feasibility. Therefore, the Court looks at what was reasonably available to Mr. Weeks in his circumstances in February 1992.

Mr. Weeks alleged, and has provided sufficient supporting evidence to show, that DNA testing was not reasonably available to him at the time of his plea. The supplemental legal file contains an affidavit from Dr. Robert Briner, former executive director of SEMO. Dr. Briner stated that SEMO did not conduct any DNA testing in 1992, and it had no equipment with which to do so. Moreover, he said, SEMO did not have sufficient funds to conduct DNA testing until 1994 and did not issue its first DNA report until September 1995.

Mr. Weeks also provided an affidavit from his plea counsel, former public defender Gary L. Robbins. Mr. Robbins stated that he did not know of any local laboratories that performed DNA testing *in 1992.* He also said that he did not believe that any of his clients had received a DNA test during that time period.[10] There is no evidence that Mr. Weeks was personally more knowledgeable about DNA testing, and in fact the record shows that Mr. Weeks possessed only a grade-school education and, according to his plea counsel, was placed on numerous drugs at the time of his plea including Prozac, Mevacor, Diphenhydramine, insulin, and possibly Phenergan, among other drugs.

For all of these reasons, this Court determines that the motion court clearly erred in holding that Mr. Weeks failed to demonstrate that DNA testing was not reasonably available to him in 1992.

*E. Proof of a Reasonable Probability that Defendant Would Not Have Been Convicted if Exculpatory DNA Results were Obtained.*

---

**10.** The Court notes the judge below did not have the benefit of Mr. Briner's or Mr. Robbins' affidavits, which were made a part of the supplemental legal file by order of this Court while the case was pending here. Rather, the judge had only an affidavit containing the hearsay statement that one of SEMO's employees, C.R. Longwell, was trained by the FBI in DNA testing. But, the record now shows that, whatever training he had was not sufficient to permit Mr. Longwell to perform DNA testing for SEMO, he never did so, and never became certified in DNA testing.

Finally, the State argues that Mr. Weeks failed to allege sufficient facts demonstrating "a reasonable probability exists that the movant would not have been convicted if exculpatory results had been obtained through the requested DNA testing." *Sec.* 547.035.2(5). The motion court ruled that overwhelming evidence of Mr. Weeks' guilt was produced and that a DNA test would not prove his innocence because J.B. told investigators that the rapist did not ejaculate.

This was error. In fact, the victim's statement did not say that the perpetrator did not ejaculate. The motion judge's error in so stating perhaps occurred because the motion court's order denying the motion for DNA testing merely adopts verbatim the prosecution's response to Mr. Weeks' motion for DNA testing. While this Court has held that it is not *per se* error for a trial judge to adopt without change the wording of a party's suggestions or of proposed findings of fact and conclusions of law, *State v. Kenley*, 952 S.W.2d 250, 261 (Mo. banc 1997), this Court has also warned against doing so because "advocates are prone to excesses of rhetoric and lengthy recitals of evidence favorable to their side but which ignore proper evidence or inferences from evidence favorable to the other party." *Massman Const. Co. v. Mo. Highway & Transp. Comm'n*, 914 S.W.2d 801, 804 (Mo. banc 1996). *See also, State v. Griffin*, 848 S.W.2d 464, 471 (Mo. banc 1993) (disfavoring this practice because it creates the appearance that the judiciary is a mere rubber stamp); *E.L.S. v. F.M.S.*, 829 S.W.2d 19, 21 (Mo.App. E.D.1992) ("Even the most conscientious advocate cannot reasonably be expected to prepare a document which would reflect precisely the trial court's view of the evidence. . . . Here, the trial court's findings reflect husband's argumentative style, and several are not supported by the record.").

This case illustrates the danger of adopting a party's suggestions. A simple review of the victim's statement would have shown that she did not state that the perpetrator did not ejaculate, she said only that the rapist was interrupted on two occasions while he raped and sodomized her. And, in any event, although married, she had been at work all day and said that she had not had sex since the day before the rape. She also said that she put her pants on as soon as the rape ended. Laboratory tests found semen stains on the pants and on a swab from her vagina. The semen in these samples contained intact sperm, meaning that sexual activity had been very recent. Mr. Weeks requests DNA testing that he believes will show the semen present was not his.

If the DNA does not match Mr. Weeks' DNA, and if a jury were made aware of this fact, there is a reasonable probability that he would not be convicted because a jury could find that the perpetrator did ejaculate and that someone other than Mr. Weeks was the source of the intact sperm on the vaginal swab and on the victim's pants.

## III. CONCLUSION

For the reasons set out above, this Court holds that one who pleads guilty may still obtain DNA testing under section 547.035. To obtain such testing, the person must allege facts under oath demonstrating that there is evidence upon which DNA testing can be undertaken that was secured in relation to the crime and not previously tested. *Sec.* 547.035.2. Mr. Weeks meets these requirements.

The movant must also present evidence that the cause of the lack of testing was one of the three possible causes listed in section 547.035.3. Here, this Court holds that Mr. Weeks has shown by a prepon-

derance of the evidence that DNA testing was not reasonably available to him at the time of his plea and that identity was at issue. Finally, for the reasons set out above, this Court holds that the trial court erred in failing to find that a reasonable probability exists that the movant would not have been convicted if exculpatory results had been obtained from the requested DNA testing. The record does not conclusively show a failure to ejaculate, and there is sufficient evidence on the record from which a jury could find at least one and perhaps two different individuals deposited seminal fluid on the victim's pants, including semen from a Type–A secretor.

Mr. Weeks has thus met all of the requirements for an order for DNA testing. To be entitled to such testing, the movant need not conclusively prove his innocence. Section 547.035.7 states that, "[t]he court shall order appropriate testing if the court finds: (1) a reasonable probability exists that the movant would not have been convicted if exculpatory results had been obtained through the requested DNA testing; and (2) that movant is entitled to relief." *Id.* This Court, having found that these requirements are satisfied, may enter the judgment the trial court ought to have entered. *Rule* 84.14. Therefore, this Court reverses and remands with directions to order appropriate testing and any other such available relief in accordance with section 547.035.7, and such other proceedings as may be appropriate.[11]

WHITE, C.J., WOLFF and TEITELMAN, JJ., concur.

PRICE, J., dissents in separate opinion filed; HOWARD, Sp. J., concurs in opinion of PRICE, J. LIMBAUGH, J., not participating.

WILLIAM RAY PRICE, JR., Judge, dissenting.

First, I agree with the majority that establishing whether DNA testing was "not reasonably available to the movant" pursuant to *section 547.035.2(3)(a)* is not solely a question of whether the technology to perform a test existed anywhere. However, it is confusing to label subsection (a) a subjective test. I disagree with the majority to the extent it is saying the test is "subjective" insofar as that would require a determination of the movant's state of mind or awareness. Instead, I believe the statute instructs the hearing court to review the objective facts surrounding each individual case to determine whether the technology, if it then existed, was reasonably available to that particular individual.

Second, this case should be remanded to the motion court for a hearing. In a post-conviction DNA-testing proceeding, the motion court may make findings of fact and conclusions of law with or without a hearing. *See section 547.035.8 RSMo Supp.2001.* Here, the motion court did not conduct a hearing, because it believed that the statute did not apply to those who pled guilty. As this was error, this Court should reverse and remand.

However, the majority opinion goes beyond this, ordering outright the DNA testing based only on allegations and attached papers. The General Assembly intended that a motion court decide whether to have an evidentiary hearing, in order that credibility may be explored—and the movant prove his allegations by a preponderance of the evidence. *Section 547.035.6.* Certain issues—1) the determination of rea-

---

**11.** The Court expresses its appreciation to Phillip R. Gibson and Professor Ellen Y. Suni of the Midwestern Innocence Project, as *pro*

*bono* appointed counsel, for their excellent representation of Mr. Weeks.

sonable availability of DNA testing in the early 1990s, 2) the reasonable probability that Weeks would not have been convicted if the DNA results were exculpatory, and 3) whether Weeks can overcome the factual admissions made in his guilty plea—should be decided first by a motion court.